UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.

Criminal No. 12-cv-142-JL
Opinion No. 2014 DNH 046P

<u>Robert Joubert</u>

## <u>MEMORANDUM ORDER</u>

A jury in this court convicted defendant Robert Joubert of three counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5).  Prior to the jury trial, Joubert moved to suppress evidence seized during the execution of a search warrant at his residence, including VHS recordings that figured prominently in the counts of conviction. The motion argued that the affidavit that Sean Ford, a detective with the Concord Police Department, submitted in support of the warrant application failed to establish probable cause to believe that evidence of a crime would be found at Joubert's residence or on the VHS recordings.  Citing <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the motion also argued that Detective Ford deliberately or recklessly omitted several material facts from his affidavit that would have negated probable cause had they been included.

The court held a hearing on the motion, at which Detective Ford testified and was cross-examined by Joubert's counsel.  The

court then issued, on the record at the hearing, an oral order concluding that the warrant affidavit established probable cause and that Detective Ford's purported "omissions" from the affidavit were immaterial, and thus denying Joubert's motion.  As Joubert has appealed his conviction, the court now issues this written order memorializing its findings and conclusions for the benefit of the Court of Appeals.[1]

## I.   __Background__[2]

On June 27, 2012, Detective Ford submitted a search warrant application to the 6th Circuit Court, District Division, in Concord, seeking issuance of a warrant to search Joubert's residence at 144 Fairmont Avenue in Manchester.  The application sought authority to search for, seize, and analyze fifteen categories of evidence, including (as is pertinent here) "[a]ny and all computers or related electronic storage devices and media"; "[a]ny and all cameras . . . including cassette tapes,

---

[1] See In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007) ("[A] lower court has jurisdiction to reduce its oral findings to writing even if a party has filed a notice of appeal in the interim."); 16A Charles Alan Wright et al., Federal Practice & Procedure § 3949.1, at 58-59 (4th ed. 2008) (after a notice of appeal is filed, a district court "may reduce to writing an earlier oral decision" so long as it does "not alter the substance of the decision").

[2] The court relates here only those facts, and allegations in the warrant affidavit, that are relevant to its ruling on Joubert's motion.

VCR/VHS tapes, CD's, memory cards, and developed or undeveloped film"; and "[a]ny and all photographs, electronic images, and video of minors/juveniles/youth/youth groups that Robert Joubert has or may have had contact with."

Detective Ford's application included a 14-page affidavit detailing the investigation up to that point.  The affidavit explained that earlier that year, the police department in York, Maine, had received an e-mail warning of Joubert, who at that time was operating the Seacoast Baseball Academy in York.  The e-mail, the affidavit related, had been sent by a woman in Concord who claimed that her then-juvenile son "KC" had formerly had a relationship with Joubert, and identified Joubert as a "pedophile" with a history of "police investigations and restraining orders in relation to young boys."  The affidavit then listed several of those "police investigations," including:

- Joubert's 1994 arrest for sexual assault, arising out of a 12-year-old boy's accusation that, while sleeping over at Joubert's house, he awoke to find Joubert placing the child's hand on his (Joubert's) penis;

- Joubert's 1999 arrest for sexual assault, arising out of a 17-year-old girl's accusation that Joubert had forcible intercourse with her while she was sleeping over at his apartment; and

- Joubert's 2004 arrests for, respectively, violation of a civil protective order and contempt of a civil protective order, both arising out of "Joubert's reportedly harassing behavior" toward KC.

3

Although none of these charges resulted in a conviction, the
affidavit did not expressly mention that fact.

After receiving the e-mail, the affidavit explained, the
York police and the FBI then proceeded to interview various
individuals associated with Joubert.  The affidavit reported that
the owner/operator of a baseball training facility in Newington,
New Hampshire confirmed that Joubert was employed there as a
youth baseball instructor from late 2006 through mid-2009, but
had been terminated due to complaints from parents that he had
photographed players at a swimming pool during a trip to Florida
and had showed up at a juvenile player's home while the child's
parents were not there.  That same person, according to the
affidavit, reported that Joubert had "questionable contacts" with
one boy in particular, "EZ," while working at the facility.  The
affidavit also claimed that two later interviewees--whose
juvenile son had, like EZ, been coached by Joubert in Newington--
made similar allegations (of inappropriate videotaping, visiting
a child's home while the child's parents were not present, and
close contact with EZ) against Joubert.[3]

---

[3]The affidavit also related that other interviewees familiar
with Joubert due to his involvement in youth baseball had
expressed concerns about Joubert's behavior, asserting, among
other things, that Joubert had asked children to go camping and
other places with him, alone; had attempted to contact 9- and 11-
year-old boys on Facebook; had shown up uninvited at residences
and events; and that, as late as 2008 and 2009, Joubert had been

Based upon these allegations, the affidavit explained, the investigators spoke to both KC and EZ, the latter of whom stated that he was involved with Joubert from the ages of 9 to 11, during which time he had "numerous unsupervised contacts" with Joubert.  According to the affidavit, EZ claimed that he had "questionable physical contact" with Joubert, which EZ characterized as Joubert "making a pass at him."  The affidavit related claims by EZ that Joubert had performed upper-body massages on him while EZ was shirtless, and that on one occasion, Joubert had taken EZ into a back room at the Newington facility and "repeatedly tried to touch [his] crotch area."  The affidavit further stated that KC, for his part, "disclosed several instances of sexual abuse against him by Joubert" in 2004, when Joubert was coaching him in youth baseball.

The affidavit also recounted the interviews of several other individuals who claimed that Joubert had sexually abused them, or otherwise had inappropriate physical contact with them, while they were minors:

- "NT" claimed that Joubert had sexually abused him in 1994, when NT was 12 years old (an incident that was the basis for Joubert's 1994 arrest for sexual assault, mentioned above).

- "KH" claimed that one night sometime in the time period of 1998-2000, when he was between the ages of 7 to 9, he slept

---

observed photographing juvenile players at baseball fields and tournaments.

at Joubert's apartment in Concord after Joubert had brought him to a baseball game, and awoke to find Joubert sucking on his big toe.

- "MT" claimed that during a three- to four-year period from 1994-1998, when he was between the ages of 8 and 12, Joubert sexually abused him two to five times a week, and "hundreds of times" in total.  These incidents, which occurred while MT was living with or near Joubert in Concord, and on one occasion when Joubert transported MT to Cooperstown, New York, primarily involved MT masturbating Joubert.  According to MT, Joubert "took pictures of him playing sports, fishing, and at the beach and other locations."[4]

- Joubert's adult son, "SJ," claimed that Joubert had sexually abused him twice, around 1984 and 1986, when SJ was 9 and 11 years old.  According to the affidavit, these incidents were "masterbatory [*sic*] in nature."

Much of the information conveyed in the affidavit dealt with SJ.  The affidavit related that SJ had delivered a computer tower to the Concord police, asserting that the tower belonged to Joubert and that "he suspected that the hard drive contained incriminating information."  According to the affidavit, SJ claimed that he had recently assisted Joubert in moving to the Fairmont Avenue property and that Joubert, who "was anxious because he was being investigated by the FBI," "tore apart the computer tower, trying to remove the hard drive" and asked SJ how to destroy the hard drive.  SJ also claimed, according to the

---

[4]Detective Ford's affidavit also related that MT's mother confirmed that she had been in a relationship with Joubert in the mid- to late 1990's, but claimed to have ended that relationship because Joubert was "way too close" with MT and she suspected that Joubert molested him.  According to the affidavit, Joubert's adult son also stated that Joubert "spent a lot of time with MT."

affidavit, that Joubert said he had "client and financial information" on the hard drive "that he did not want getting out," and that he had recently had the hard drive "cleaned" but believed this may not have erased everything.

The police recorded and transcribed their interview with SJ when he delivered the computer tower to them.  The transcript of this interview reveals that SJ professed to believe "that there is probably child pornography on that computer," but admitted that he "never saw any" child pornography on the computer or in magazines at Joubert's house, and that the likelihood that there was child pornography on the computer was "purely an assumption on my part."  In recounting this interview, the affidavit stated that "SJ strongly suspected, based on [Joubert's] actions, demeanor, and past history with NT and himself, that there was child pornography or some other incriminating information in the computer."  The affidavit did not expressly recount SJ's admission that his opinion about the presence of child pornography on the computer was "purely an assumption," nor did it state that SJ said that he had never seen any magazines depicting underage sexual images at Joubert's house.

The affidavit also mentioned that SJ had agreed to record a meeting with Joubert about a week after delivering the computer to the Concord police.  The transcript of the recording, which

was not submitted with the warrant application, reveals that
Joubert vehemently denied the allegations of sexual abuse made by
NT and KC.  The transcript further reveals that SJ segued from
discussing NT's allegations against Joubert into SJ's own
allegations of sexual abuse against Joubert:

> S[5]   [What NT claimed is] awfully similar to what
> happened to me.
>
> R    No.  No.
>
> S    Really?
>
> R    No.  No.
>
> S    Well, see, that's what's going to -- that's what
> going to be the deciding factor.
>
>     .  .  .
>
> R    [I] know I've done some things -- [SJ interjects]
> -- and I know I've done some wrong things.  And I
> do apologize.  I do.
>
>     .  .  .
>
> R    And I've apologized.  I just told you, you know,
> I've done some things wrong, I'm not perfect, but
> I know I don't -- I don't --
>
> S    Like what?  I mean, what are you talking about?
> What are you talking about?
>
> R    Well, what are you talking about?  What are you
> talking about?
>
> S    What am I talking about?

--------

[5]The transcript of the recorded conversation uses "S" to
refer to SJ, and "R" to refer to Joubert.

R    Okay.

S    Do you want me to really get into it?

R    [SJ,] okay?  I --

S    Can we be man to man?

R    Listen, I don't --

S    For once in our life.  We've never once had a word
     about this.  And I'm done.  I'll tell you right
     now, I'm done, because if we don't, then we're
     done with you.  And if we're done with you,
     everybody's done with you.  Right?  It's not like
     I can just black it out.  It's not like I can just
     erase it from my fucking head.

R    How much can I apologize for the things I've done
     wrong?  How much?

     . . .

S    . . . We've all fucked up, we've all made
     mistakes, and I've accepted that and I've lived
     with that, and I'm okay with that.  But don't
     fucking sit here and tell me I'm crazy.

R    I'm not saying you're crazy.

S    All right.  Don't say I don't have a reason to
     want an apology for what happened, because I think
     it's a hundred percent warranted, and that's a
     very little price to pay.  Am I right?

R    Yeah.

S    I mean, I was there, you were there.  And it's
     awful similar to what happened to me, and that's
     why I kind of do believe [NT], I do.

R    I know you believe him over me.

S    Do I have a reason not to?  I know you're my
     father.  I know you were a hell of a father.  But

                              9

```
         do I have a reason not to?  Should I look at [NT]
         and be like "Dude, you're crazy"?

         . . .

R        . . . I can look you straight -- straight in the
         eye --

S        Okay.

R        -- and I know I didn't do anything.

S        All right.  And I can live with that.  But you ___
         and you can't look me in the eye and tell me that
         you didn't do anything with me.  Am I right?

R        I'm ashamed about a lot of things I did.

S        All I want is a sorry.

R        A lot, a lot, a lot.  And I'd lose my temper and
         do -- and it's not all right.  It's not all right.
         ___ none of this is all right.  And I don't know
         if you'll ever accept my apology.

S        I think I can.  Lived with it for, what, almost 30
         years with it?  I'm bad in my head but 20+ years
         anyway, and I've never shunned you.  I've made you
         a part of my family.  So, tell me I'm crazy.  Tell
         me I'm crazy and you'll never see me again.

R        No.

S        Do you need help?

R        I'm not that kind of person.

S        Between me and you.

R        I'm not that kind of person.

S        Do you need help?

R        No, I'm not that kind of person, [SJ].

S        I know you don't want to be that kind of person.
```

10

```
R    It's not that I don't want --

S    You were that kind of person, right?  What
     happened?  What was it?  Was it me?

R    (No audible response).

S    So, it was you?  Well, I think you need these.  I
     know you're ashamed about ___.  I'm ashamed that
     it ever happened.

R    It'd never be you[r] fault anyway.

S    I know.  But what if me not saying something has
     led to it happening to somebody else?  How would I
     be able to live with myself then?

R    No.  Nothing has happened with anyone.

S    Okay.

R    Nothing.  Nothing.  Nothing.
```

With respect to this conversation, Detective Ford's affidavit

noted only:

> SJ met with his father at 144 Fairmont Ave in
> Manchester, NH and the conversation was recorded.  They
> discussed previous allegations against Robert Joubert
> and his abuse of SJ.  In regards to the sexual abuse of
> SJ, Robert Joubert made no denials, apologized and
> became emotional.  He then denied allegations made by
> others.

The affidavit further related that SJ had informed Detective

Ford that Joubert was residing at the Fairmont Avenue property,

and that Joubert "had access to the entire residence" and had

"numerous boxes, bags, and containers" that were "strewn about

the residence and on the enclosed porch."  SJ is the sole source

of evidence concerning Joubert's residence at the Fairmont Avenue

property listed in the affidavit.  While SJ has a lengthy
criminal record that includes a 1996 conviction for forgery, no
information concerning SJ's criminal record is listed in the
affidavit.  At oral argument on Joubert's motion, Detective Ford
testified that he was aware that SJ had a criminal record, but
could not recall if he had looked at SJ's criminal record prior
to applying for the warrant.

Detective Ford closed the affidavit by attesting that, based
upon his training and experience (related at the beginning of the
affidavit), he knew "that persons engaged in the molestation and
exploitation of . . . minors often maintain possession and/or
control of physical or electronic documents pertaining to their
victims and other juveniles."  Detective Ford stated his belief
that Joubert was in possession of evidence of the crime of
felonious sexual assault, in the form of physical and electronic
documents which could confirm or dispel "the allegations made
against [Joubert] involving juveniles, his travels, [and] his
relationship(s) with minors/juveniles and the victims mentioned
in this affidavits."

Relying on the information conveyed in the affidavit, a
Circuit Court judge issued a warrant authorizing a search of the
Fairmont Avenue property for evidence of the crimes of sexual
assault, and further authorizing the seizure for analytical

purposes of the fifteen categories of evidence previously
mentioned.  The warrant was executed the following day.  During
the search, law enforcement seized, among other things, the VHS
recordings that formed the basis of the counts of which Joubert
was convicted.

## II.  **Analysis**

### A.  **Existence of probable cause in warrant affidavit**

The Fourth Amendment to the U.S. Constitution protects
"[t]he right of the people to be secure in their persons, houses,
papers, and effects, against unreasonable searches and seizures,"
and provides that "no Warrants shall issue, but upon probable
cause, supported by Oath or affirmation, and particularly
describing the place to be searched, and the persons or things to
be seized."  U.S. Const. Am. IV.  Generally, then--with some
exceptions that have no applicability here--the Fourth Amendment
"requires police officers to secure a search warrant supported by
probable cause prior to effecting a search or seizure."  United
States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013).  "Information
supporting probable cause for a warrant is often set forth in an
affidavit provided by a law enforcement officer, as happened
here."  Id.  That affidavit "must demonstrate probable cause to
believe that:  1) a crime has been committed, and 2) enumerated
evidence of the offense will be found at the place to be

searched--the so-called 'nexus' element." United States v.
Hicks, 575 F.3d 130, 136 (1st Cir. 2009) (some internal quotation
marks omitted).

Joubert's motion appears to concede that Detective Ford's
affidavit demonstrated probable cause to believe that a crime had
been committed (and Joubert's counsel made no argument to the
contrary at oral argument).  That is a wise concession:  as
discussed in the previous section, the affidavit related that
several individuals accused Joubert of sexually abusing them
while they were underage, while other individuals described
conduct suggesting that Joubert had an unusual interest in
children (certain accusers included), buttressing the abuse
accusations.[6]  In asserting that the affidavit did not establish
probable cause to search his residence, Joubert instead argues
that there was no reason to believe, based upon the allegations
in the affidavit, that evidence of any crime would be found

_____

[6]Joubert did not contest the credibility of most of his
accusers, so the court did not address that in its oral ruling.
The court notes, however, that several factors contributed to the
accusers' credibility.  Among other things, the accusers, who
were many different ages at the time they were interviewed by law
enforcement--ranging from 14 to 36--all claimed that Joubert had
abused (or attempted to abuse) them when they were between the
ages of 8 and 12.  The incidents reported by several of the
accusers were very similar in nature, insofar as they consisted
of Joubert causing the alleged victims to masturbate him.  In
addition, other individuals corroborated certain details of the
accusers' stories.

there.  In Joubert's view, the affidavit "fail[ed] to establish
the requisite temporal and geographical nexus linking [the]
allegations [of sexual abuse and inappropriate conduct with
minors] to whatever might exist on June 28, 2012 at 144 Fairmont
Avenue in Manchester and to the VHS tapes here at issue."  Mot.
to Suppress (document no. 12) at 4.

The court cannot agree.  The basis for Joubert's argument is
the absence of any allegations in the affidavit that he "ever
engaged in any sexual or other misconduct at 144 Fairmont Avenue
or anywhere else in Manchester," that he "recorded any sexual
contact by or toward anyone," including children, that he ever
"viewed, possessed, or collected child pornography," or that he
"sexually assaulted or tried to sexually assault anyone anywhere
after 2004."[7]  Id. at 5.  Yet there is little significance to
these facts.  As the court explained in its oral ruling, the
absence of any allegations that any sexual abuse occurred at the
Fairmont Avenue property is immaterial, because the relevant
question is not whether crimes have taken place at the property

---

[7]Joubert also decries the manner in which Detective Ford's
affidavit (1) characterizes Joubert's answers during an interview
with law enforcement as "evasive, confrontational, vague, and
unresponsive" and (2) suggests that Joubert "inflated his history
as a coach and an athlete."  Mot. to Suppress (document no. 12)
at 4.  The court agrees with Joubert that these allegations add
little, if anything, "to the probable cause equation," id., but
even if they are disregarded entirely, that does not change the
likelihood that evidence might be found at Joubert's residence.

to be searched, but whether evidence of a crime might be found there.  See Hicks, 575 F.3d at 136.  Similarly, the absence of allegations that Joubert had ever produced or viewed child pornography is immaterial, because--as the court also noted at oral argument--it was not evidence of the crime of producing or possessing child pornography that was sought, but evidence of the crime of felonious sexual assault, in the form of photographs, documents, or other evidence, that could corroborate or disprove the allegations that had been made against Joubert.

Joubert's claim that there are no allegations that he had "sexually assaulted or tried to sexually assault anyone anywhere after 2004" is simply inaccurate.  As discussed in the preceding section, EZ alleged that at one point some time between 2006 and 2009, when he was between 9 and 11 years old, Joubert "made a pass at him" and "repeatedly tried to touch [his] crotch area."  But even if Joubert were correct, the absence of allegations of post-2004 abuse would be only marginally significant.  To be sure, the passage of a significant amount of time between the date of alleged criminal activity and the date of the warrant application might, in some cases, reduce the likelihood that a search will turn up evidence of the crime.  Courts confronted with suppression motions, however, "do not measure the timeliness of collected information mechanistically, merely counting the

number of days elapsed." United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). "Rather, a number of integers must be factored into the calculus--e.g., the nature of the information, the nature and characteristics of the supposed criminal activity, the nature and characteristics of the place to be searched, the nature of the items delineated in the warrant--and the likely endurance of the information must be gauged on that basis." Id.

Here, the nature of the items delineated in the warrant-- including photographs and other documents connecting Joubert to his accusers and to the sites of alleged abuse, such as Cooperstown, New York--made it likely that those items would still be in existence and in Joubert's possession several years after the alleged incidents of abuse. As the court observed at the suppression hearing, the warrant affidavit included allegations that Joubert had taken numerous photographs or videos of a number of youths, including at least one of the alleged victims, and it is common for people to maintain copies of photographs and videos not only for years, but for decades. The likelihood that Joubert would have kept such materials in his possession for years after they were taken is only heightened by witness statements regarding Joubert's unusual interest in children. It is common, moreover, for people to keep personal

17

materials such as photographs and videos at their home, which was the exact place the warrant sought to search.

The court therefore concludes that the affidavit, as submitted to the Circuit Court, established probable cause to believe that a crime had been committed and that evidence could be located at Joubert's residence in Manchester.

### B.   Alleged omissions from the affidavit

The court's conclusion that the affidavit established probable cause does not entirely resolve Joubert's motion.  As noted at the outset, Joubert also argues that Detective Ford ran afoul of Franks v. Delaware, 438 U.S. 154 (1978), by intentionally or recklessly omitting material information from his affidavit.  In that case, the Supreme Court observed that the Fourth Amendment's demand for "a factual showing sufficient to comprise probable cause" assumes "there will be a truthful showing . . . in the sense that the information put forth is believed or appropriately accepted by the affiant as true."  Id. at 164-65 (emphasis in original; quotation marks omitted).  Thus, where an affiant's "perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to

18

the same extent as if probable cause was lacking on the face of the affidavit." Id. at 156.  This reasoning "logically extends, as lower courts have recognized, to material omissions" from the application.  2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.4(b), at 543-45 (4th ed. 2004); see also, e.g., United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002); United States v. Charles, 213 F.3d 10, 23 (1st Cir. 2000).

Joubert charges that Detective Ford either intentionally or recklessly omitted four pieces of information from his affidavit:

- the fact that Joubert's 1994, 1999, and 2004 arrests did not result in criminal convictions;

- SJ's statement, during the interview that occurred after he delivered Joubert's computer to the police, that his belief that there was "probably" child pornography on the computer was "purely an assumption on my part," and not based on his personal observation of child pornography in Joubert's possession;

- the fact that, during the recorded conversation with SJ, Joubert stated that "nothing has happened with anyone" and responded to SJ's statement that NT's accusation against Joubert was "awfully similar to what happened to me" with "No.  No," both of which Joubert contends were denials that he had sexually abused SJ, contrary to what the affidavit claimed; and

- SJ's 1996 conviction for forgery.

As the court explained in its oral ruling, it does not view the first three alleged "omissions" as omissions at all, let alone intentional or reckless omissions.  No extensive analysis is necessary:

19

- Where the affidavit did not identify the disposition of Joubert's arrests, no reasonable magistrate would conclude that those arrests had resulted in a conviction.  To the contrary, the far more reasonable reading of the warrant affidavit is that the arrests had not resulted in convictions, an inference drawn from the absence of any allegation in the affidavit that Joubert had been convicted of any crime.

- Along the same lines, where the affidavit did not state that SJ claimed to have seen child pornography in Joubert's possession, no reasonable magistrate would conclude that SJ's professed belief that Joubert's computer contained child pornography was anything other than "purely an assumption."  In fact, the affidavit stated as much, noting that SJ said only that he "strongly suspected" that there was child pornography on the computer "based on [Joubert's] actions, demeanor, and past history."

- The affidavit's statement that "in regards to the sexual abuse of SJ, Robert Joubert made no denials, apologized, and became emotional" accurately characterizes the exchange between Joubert and SJ, which is excerpted in relevant part in Part I, <u>supra</u>.  When read in the context of the entire conversation, Joubert's negative response to SJ's statement that NT's accusation was "awfully similar to what happened to me" and his statement that "[n]othing has happened with anyone" can only be understood as denials of accusations of sexual abuse made by other individuals, and not of SJ's accusation of sexual abuse.

The affidavit's treatment of these subjects was in no way untruthful or likely to mislead the magistrate.

The court does agree with Joubert that the affidavit should have mentioned SJ's forgery conviction.  While Detective Ford's omission of this information does not appear to be intentional, it was quite possibly reckless.  As this court has previously explained, "'recklessness may be inferred'" if the omitted information "consisted of 'facts that any reasonable person would

20

know that a judge would want to know when deciding whether to issue a warrant.'" United States v. Tanguay, 907 F. Supp. 2d 165, 177 (D.N.H. 2012) (quoting Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005)).  A conviction for a crime of dishonesty such as forgery "is unquestionably a fact that any reasonable officer would consider critical" to determining an informant's credibility.[7] Id.  Indeed, Detective Ford testified at the suppression hearing that he would ordinarily inform the magistrate of an informant's forgery conviction when applying for a warrant (although he was less sure that he would include such information in a warrant affidavit), demonstrating his awareness that a magistrate would want such information.  He offered no explanation for his failure to do that in this case, apart from speculating that--despite his awareness that SJ had a criminal record--he had either not viewed that record before swearing out

---

[7]The court should note that Joubert's motion also mentions that SJ has a raft of other criminal convictions.  None of those other convictions, however, was for a crime of dishonesty, and the Court of Appeals has held that "[a] criminal record, no matter how lengthy, does not necessarily impugn one's veracity." United States v. Rumney, 867 F.2d 714, 720-21 (1st Cir. 1989). SJ's other convictions, then, are not the type of fact that "any reasonable person would know that a judge would want to know when deciding whether to issue a warrant," and Detective Ford did not act recklessly, or even negligently, by omitting them from his affidavit.  See United States v. Adams, 305 F.3d 30, 36 (1st Cir. 2002) (observing that an informant's crimes not involving false statements "had at most a remote bearing on [his] credibility" so that their omission from a warrant application did not support a Franks challenge).

his affidavit, or simply "browsed" it.  In such circumstances,
Detective Ford's failure to apprise the magistrate of the forgery
conviction might well be characterized as reckless (although that
is not necessarily a foregone conclusion, cf. id. at 182-83
(rejecting argument that officer acted recklessly by not
performing criminal records check on informant and including
results in her warrant affidavit)).

Even if the omission of SJ's forgery conviction from the
affidavit was reckless, however, suppression of the fruits of the
search is not warranted.  Where information has been recklessly
omitted from a warrant affidavit, "suppression should be ordered
only if the warrant application, . . . clarified by disclosure of
previously withheld material, no longer demonstrates probable
cause." United States v. Stewart, 337 F.3d 103, 105 (1st Cir.
2003).  Here, even if the fact of SJ's forgery conviction had
been disclosed to the magistrate, as it should have been, the
warrant affidavit would still demonstrate probable cause for the
search.  Joubert suggests otherwise, arguing that the forgery
conviction so undermines SJ's credibility that his claim that
Joubert lived at the Fairmont Avenue property--in Joubert's
telling, the sole "nexus" between Joubert and that address--could
not be believed, thus depriving the magistrate of probable cause
to believe that evidence would be found there.  But, as the court

22

noted at oral argument, at least one other fact related in the
affidavit established Joubert's presence at the Fairmont Avenue
property, namely, that the recorded conversation between SJ and
Joubert took place there.

That SJ and Joubert met and conversed at that property also
bolstered SJ's credibility, insofar as it provided some objective
verification of one of SJ's claims.  See United States v. Zayas-
Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (identifying "whether some
or all of the informant's factual statements were corroborated
wherever reasonable and practicable" as a factor affecting the
probable cause determination).  The affidavit also indicated that
law enforcement corroborated several other factual claims that SJ
had made, including that (1) Joubert's parents owned the Fairmont
Avenue property, (2) Joubert had previously lived in Concord with
MT's mother, and (3) Joubert "spent a lot of time with" MT.  That
these facts could all be independently verified also made it more
probable than not that SJ was being truthful that Joubert was, at
that time, living at the Fairmont Avenue property.  Also
enhancing SJ's credibility is the fact that he made no attempt to
conceal his identity from the police, and in fact allowed them to
record his conversation with Joubert while asking nothing in
return.  See United States v. Croto, 570 F.3d 11, 14 (1st Cir.
2009) (where witness identifies himself to law enforcement, that

"in itself bolsters [his] credibility because it opens [him] up for charges related to making a false report," particularly where witness "willingly provided the information and received nothing in return").

Given these indicia of reliability, inclusion of SJ's sixteen-year-old conviction for forgery in the affidavit would not have undermined the credibility of his claim that Joubert lived at the Fairmont Avenue property.  The omission of the fact of that conviction from the affidavit did nothing to undermine the ample probable cause, discussed in the foregoing section, to believe that evidence of a crime would be found at that address. Joubert's motion must, therefore, be denied.

## III. **Conclusion**

Because the application for the warrant to search Joubert's residence and the VHS tapes therein, even when clarified by the facts that Detective Ford omitted, established probable cause to believe that evidence of a crime would be found in those locations, the court DENIED Joubert's motion to suppress the evidence found during those searches.[8]

---

[8]Document no. 12.

**SO ORDERED.**

_____

Joseph N. Laplante
United States District Judge

Dated:  March 4, 2014

cc:  Bjorn R. Lange, Esq.
     Helen W. Fitzgibbon, Esq.